IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


MANN V. LAMBERTSEN


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


BRANDI K. MANN, APPELLEE,

V.

CHRISTOPHER J. LAMBERTSEN, APPELLANT.


Filed March 11, 2025.    No. A-24-555.


Appeal from the District Court for Wayne County: MARK A. JOHNSON, Judge. Affirmed as modified.

Michele Lewon for appellant.

Frederick T. Bartell, of Fitzgerald, Vetter, Temple, Bartell & Henderson, for appellee.


RIEDMANN, Chief Judge, and BISHOP and ARTERBURN, Judges.

RIEDMANN, Chief Judge.

## I. INTRODUCTION

The district court for Wayne County issued a paternity, custody, and parenting time decree concerning a minor child born out of wedlock. The decree awarded the mother sole legal and physical custody of the minor child subject to the father's parenting time. The father appeals. Finding no abuse of discretion by the district court, we affirm the custody award but modify the decree to allow the father the child tax exemption beginning in 2024 and every even year thereafter.

## II. BACKGROUND

Brandi K. Mann and Christopher J. Lambertsen are the biological parents of Scarlet, born in 2022. The parties were never married but were in a dating relationship at the time of Scarlet's birth and Lambertsen signed an acknowledgment of paternity. Mann and Lambertsen moved in

- 1 -

together shortly after Mann became pregnant but separated in January 2023, a few months prior to Scarlet's first birthday.

## 1. PRETRIAL PROCEEDINGS

In February 2023, Mann filed a complaint to establish paternity, custody, and support. Mann's complaint requested she and Lambertsen be found to be the natural parents of Scarlet, she be awarded sole legal and physical custody, and Lambertsen be ordered to pay child support. Mann later filed a motion for temporary orders requesting sole physical and legal custody of Scarlet and child support.

Lambertsen filed an answer and counterclaim, admitting he was Scarlet's father and requesting the parties be awarded joint legal and physical custody. His counterclaim also requested the court award him the right to claim Scarlet as a dependent on his taxes every year.

In April 2023, the district court ordered the parties to participate in mediation. It also entered a journal entry awarding Lambertsen weekly parenting time from Tuesday through Thursday pending a ruling on Mann's motion for temporary orders.

The record shows the parties participated in mediation in May 2023, but were unable to reach an agreement. A few days after mediation concluded, the court issued a temporary order granting the parties joint legal and physical custody of Scarlet and ordering the parties alternate parenting time on a 14-day basis. The temporary order also included a provision allowing the parties to call Scarlet twice per week during the other parent's parenting time; neither parent was ordered to pay child support.

In February 2024, Lambertsen filed a motion for leave to amend his answer and counterclaim to request sole physical custody. The amended complaint alleged that the joint physical custody initially requested would not be feasible after Scarlet reaches school age. Alternatively, Lambertsen requested the court order joint legal and physical custody. The court issued a journal entry which granted Lambertsen's motion to amend and set a trial date for May.

## 2. TRIAL

At trial, both Mann and Lambertsen testified to the following. The parties began a dating relationship in August 2021. At that time, Lambertsen was residing in Iowa with his mother and stepfather, while Mann was residing independently in Nebraska. Lambertsen relocated to Mann's home in Nebraska in October, after the parties discovered Mann was pregnant with Scarlet.

After Scarlet was born, the parties continued living together; Lambertsen worked outside the home while Mann stayed home with Scarlet. Mann and Lambertsen would share equally in caring for the newborn when Lambertsen returned from work. When Scarlet was 5 months old, Mann started a new job.

During the parties' relationship, Lambertsen felt as if he did not have a say in decisions made for Scarlet. For example, he described feeling as if his opinion was irrelevant when it came to what to feed Scarlet. However, he testified the parties agreed to baptize Scarlet in Mann's faith and send her to a daycare chosen by Mann, but when Lambertsen had concerns about that daycare, Scarlet stopped attending and daycare was divided between Mann's grandmother and Lambertsen's mother.

Sometime around January 2023, the parties' relationship ended. Lambertsen moved back into his mother's home in Iowa; Mann and Scarlet continued living in Nebraska. Scarlet resided with Mann the majority of the week and with Lambertsen every Tuesday through Thursday until the temporary order for joint custody was entered.

At the time of trial, Mann, age 26, lived with Scarlet in a home owned by Mann's grandparents and had plans to purchase the home, although she had not taken any steps to do so. She worked for the local parochial school system as a daycare provider 4 days per week for 40 hours, and her schedule was flexible. During Mann's parenting time and while she was working, Scarlet attended a different daycare, which Mann independently paid for.

Prior to the initiation of the parties' court proceedings, Mann had made the decision to enroll Scarlet in the daycare where she was employed, and eventually have Scarlet attend the affiliated preschool and grade school. Mann would receive an employee discount on tuition and had been in communication with the school regarding receiving further financial aid. She expected to know whether Scarlet was accepted into the daycare by October 2024.

Lambertsen, age 30, was still living with his mother and stepfather at the time of trial. Lambertsen had never lived independently. Although he did not intend to reside with his mother forever, he did expect to continue doing so for the foreseeable future. He did not pay rent, utilities, or any bills, and did not buy groceries or toiletries for himself or Scarlet. Rather, his mother and stepfather paid for their expenses, although he would occasionally buy some items himself.

Lambertsen was employed at a grocery store and typically worked 5 days per week for 30 to 32 hours, although he could work longer hours when needed. During his parenting time, Lambertsen's mother cared for Scarlet while he worked. However, if he were awarded sole physical custody, Lambertsen did not intend for his mother to continue caring for Scarlet every day. Rather, there was a potential daycare for Scarlet near his home, which he had not yet applied for. Lambertsen's mother helped him research schools in his residential area, and he presented evidence of a "high-performing public elementary" which Scarlet could attend when she was old enough.

Although Mann had no problem with Lambertsen's mother assisting him with childcare, observations of his mother had caused Mann to wonder who predominantly parented Scarlet during Lambertsen's parenting time. Mann felt Scarlet was spending the majority of Lambertsen's parenting time with his mother.

Mann also stated Lambertsen's mother was the person with whom she communicated most regarding Scarlet and was almost always who picked Scarlet up at the start of Lambertsen's parenting time. Mann estimated Lambertsen had picked up Scarlet only three times since the temporary order was entered. Mann claimed Lambertsen's mother facilitated almost all court ordered phone calls between Mann and Scarlet during Lambertsen's parenting time. Lambertsen did not know whether Mann was calling Scarlet while he was at work, as Mann mainly contacted his mother.

Lambertsen's biggest criticism of Mann's ability to raise and care for Scarlet was Mann's lack of communication regarding Scarlet's medical needs. According to Lambertsen, Mann had failed to give him advance notice of Scarlet's doctor appointments, lied about Scarlet being diagnosed with COVID-19 and about Scarlet's doctor being concerned with the child's weight, minimized Scarlet's severe diaper rash, and had not communicated her concerns that Scarlet may

have diabetes. He was generally concerned about Mann's ability to make decisions regarding Scarlet's medical care. However, other than the lack of communication regarding Scarlet's medical care, Lambertsen had no concerns about Mann's parenting and thought she was "an amazing mother."

Exhibits show Mann scheduled many of Scarlet's appointments with her primary care physician, who was located in Nebraska. Although Mann admitted she did not give Lambertsen advance notice of Scarlet's doctor appointments, she introduced various exhibits which showed her communicating with Lambertsen and his mother about Scarlet's doctor appointments and informing them of health updates.

Further, Mann explained that Lambertsen's impression that Scarlet had COVID-19 resulted from a misunderstanding; Mann herself had tested positive, and she believed Scarlet had contracted the virus because Scarlet had respiratory symptoms. Text messages, however, confirmed that Mann told Lambertsen Scarlet had tested negative for COVID-19. Regarding the weight issue, Mann stated her grandmother had taken Scarlet to her last appointment and had informed Mann that the doctor was "a little concerned" with Scarlet's weight. Mann discovered this was untrue after she double checked with the doctor. As to the diaper rash, Mann testified that although she saw the diaper rash to be less severe than Lambertsen, she did not ignore it and took steps to treat it. Also, the exhibits depicted text messages in which Mann informed Lambertsen she was having Scarlet tested for diabetes and explained her reasoning.

Lambertsen agreed there were text messages between him and Mann which showed Mann had informed him about Scarlet's upcoming doctor appointments and existing health concerns. He also agreed Mann and his mother talked "all the time" and had a good relationship talking about the child. He stated he would "talk to [his] mom about the appointments and she[] [would] explain" them to him.

Lambertsen stated that his mother had found the doctor which Scarlet saw on an as-needed basis during his parenting time, and she typically scheduled Scarlet's appointments; he did not know the doctor's name. Also, his mother was the one who communicated with Mann regarding Scarlet's appointments with this doctor.

Ultimately, Mann testified, if not for the distance between the parties' residences and the impact it would have on Scarlet's routine once she was old enough to begin school, joint physical custody would be appropriate. Despite her request for sole legal and physical custody contained in her complaint, Mann introduced a proposed parenting plan which awarded the parties joint legal custody and Mann sole physical custody. She testified, in lieu of such an order, she would request the court order joint legal and physical custody with a provision requiring Scarlet attend school in Nebraska.

Lambertsen testified that prior to the trial, he and his mother had discussed what sort of parenting plan he should propose; however, he never introduced a proposed parenting plan at trial. When asked whether joint custody would be the best scenario for Scarlet and the parties, Lambertsen stated he was unsure and ultimately testified he was asking the court to award him sole physical custody. He also stated, however, if not for the communication issues pertaining to Scarlet's health and routine, joint physical custody would likely work.

Mann also testified that the parties had previously agreed to claim Scarlet as a dependent on their taxes in alternating years, but that she had accidently claimed Scarlet on her 2022 and

2023 taxes. Lambertsen confirmed that the parties had previously agreed to this dependency tax exemption arrangement and stated he was requesting the district court order he "be allowed to claim her moving forward."

## 3. DISTRICT COURT'S DECREE

The district court entered a decree of paternity, custody, and parenting time. The decree stated there was no dispute that the parties were Scarlet's natural parents and awarded Mann sole legal and physical custody subject to Lambertsen's parenting time every other weekend.

The decree included factual findings regarding Scarlet's best interests which supported the court's determination to award Mann sole legal and physical custody, including: Mann had always been with Scarlet except when sharing custody with Lambertsen after their separation; the area in which Mann lived had been Scarlet's most consistent locale; Scarlet's daycare and medical providers were located in this same area; Lambertsen had not lived on his own to demonstrate how he would care for Scarlet without his mother's full-time assistance; Mann appeared to have a more even temperament than Lambertsen; Mann's employment provided assistance with daycare and schooling when Scarlet reached the appropriate age; Mann's employment allows more time with Scarlet during the week; Mann had made most of the decisions regarding Scarlet's medical, social, and educational needs; and, Scarlet's

> home state is that of Nebraska, not that of the state of Iowa, where [Lambertsen] resides and such distance will present an unacceptable impediment to Scarlet's development if joint physical custody is awarded and an unknown factor if physical custody awarded to [Lambertsen] as his fitness to parent is in large part dependent upon the presence and assistance of his mother who appears to have exercised the greatest parental control when [he] has Scarlet in his care.

The decree also included a court created parenting plan which granted Lambertsen parenting time every other weekend and for 6 continuous weeks during Scarlet's school summer vacation. Lambertsen was ordered to pay child support in the amount of $390 per month. Lambertsen was not ordered to pay daycare expenses because of the "basic subsistence limitation" provided by the Nebraska Child Support Guidelines. See Neb. Ct. R. § 4-218 (rev. 2024). He was ordered to provide Scarlet's insurance coverage if the same were available to him through his employer and his limit of unreimbursed medical expenses was set at $100 due to the basic subsistence limitation. The court's order also allowed Mann to claim Scarlet on her 2024 taxes and every even-numbered year thereafter and allowed Lambertsen to claim Scarlet on his 2025 taxes and every odd-numbered year thereafter.

Lambertsen appeals and requests we reverse the order of the district court and award the parties joint legal custody and him sole physical custody. He also requests he be allowed to claim Scarlet as a dependent on his 2024 taxes and every even-numbered year thereafter.

## III. ASSIGNMENTS OF ERROR

Lambertsen assigns as error, restated, the district court abused its discretion in awarding Mann (1) sole legal custody, (2) sole physical custody, and (3) the right to claim the tax dependency exemption for Scarlet in 2024 and even-numbered years.

## IV. STANDARD OF REVIEW

In a filiation proceeding, questions concerning child custody determinations are reviewed on appeal de novo on the record to determine whether there has been an abuse of discretion by the trial court, whose judgment will be upheld in the absence of an abuse of discretion. *Franklin M. v. Lauren C.*, 310 Neb. 927, 969 N.W.2d 882 (2022).

An award of a dependency exemption is reviewed de novo to determine whether the trial court abused its discretion. See *Kelly v. Kelly*, 29 Neb. App. 198, 952 N.W.2d 207 (2020).

An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Conley v. Conley*, 33 Neb. App. 98, 11 N.W.3d 671 (2024).

## V. ANALYSIS

### 1. District Court Did Not Abuse Discretion by Awarding Mann Sole Custody

Lambertsen separately assigns and argues the district court abused its discretion in awarding Mann sole legal and physical custody of Scarlet. For the following reasons, we reject Lambertsen's assignments of error.

Under the Parenting Act, the concept of child custody encompasses both "legal custody and physical custody." See Neb. Rev. Stat. § 43-2922 (Cum. Supp. 2024). "Legal custody" focuses entirely on decisionmaking authority and is defined as "the authority and responsibility for making fundamental decisions regarding the child's welfare, including choices regarding education and health." See § 43-2922(13). "Physical custody" means the exercise of "authority and responsibility regarding the child's place of residence and the exertion of continuous parenting time for significant periods of time." See § 43-2922(20).

While an unwed mother is initially entitled to automatic custody of the child, the issue of custody must ultimately be resolved on the basis of the fitness of the parents and the best interests of the child. *Westerhold v. Dutton*, 28 Neb. App. 17, 938 N.W.2d 876 (2020). However, the best interests of the child are the primary consideration for developing custodial plans. See *Blank v. Blank*, 303 Neb. 602, 930 N.W.2d 523 (2019).

Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) provides that in determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors:

> (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;
>
> (b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;
>
> (c) The general health, welfare, and social behavior of the minor child;
>
> (d) Credible evidence of abuse inflicted on any family or household member . . . ; and
>
> (e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Other relevant considerations include stability in the child's routine; minimalization of contact and conflict between the parents; the general nature and health of the individual child; the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Janda v. Janda*, 32 Neb. App. 953, 9 N.W.3d 212 (2024).

## (a) Legal Custody

Lambertsen contends that the district court abused its discretion in awarding Mann sole legal custody because: the court made no specific findings of why sole legal custody was in Scarlet's best interests; it should have awarded joint legal custody because the parties agreed to it; and Mann was not making good legal decisions for Scarlet. He requests we reverse the district court and order joint legal custody.

### *(i) No Specific Findings Relating to Joint Legal Custody*

Lambertsen states the district court "made findings for its decision that both legal and physical custody should be placed with [Mann] but does not make any specific findings as it relates to joint legal custody." Brief for appellant at 27. He argues that the district court included only one finding "that relates to joint legal custody." *Id*. at 28. He points to the court's finding that "[i]t appears from the evidence and observing the parties that [Mann] has been that parent who has exercised the greatest decision-making as to [Scarlet's] medical, social and educational needs." *Id*. He argues, however, that Mann was making these unilateral decisions without advising him at a time when the parties were supposed to be exercising joint legal custody.

Lambertsen points out that as opposed to Mann who failed to provide information, refused to address Scarlet's diaper rash, and "did not care about consistency or stability for [Scarlet]," he maintained consistency and stability by allowing Scarlet's primary medical care to be rendered in Nebraska. *Id*. at 29. And on those occasions when Scarlet needed urgent care in Iowa, he shared that information with Mann.

However, our review of the evidence reveals that many of Lambertsen's complaints are unfounded. For example, he claims Mann did not tell him she was worried that Scarlet had diabetes, but text messages reveal Mann advised him Scarlet was scheduled to have blood drawn to test for the disease. He accused her of telling him that Scarlet had COVID-19, yet text messages indicate Mann advised him Scarlet's test was negative. And although Mann did not view Scarlet's diaper rash as severe as Lambertsen did, she testified she did address it.

As to decisionmaking regarding Scarlet's medical, social, and educational needs, Mann testified to a solid plan for Scarlet's future daycare and educational needs whereas Lambertsen was more vague in his intentions. Moreover, Lambertsen admitted that his mother had located the local urgent care physician and helped him research potential schools for Scarlet.

We therefore find no error in the district court's finding that Mann's exercise of greater decisionmaking for Scarlet weighed in favor of granting Mann sole legal custody.

### (ii) Parties' Agreement Regarding Joint Legal Custody

Joint custody of a minor child may be placed with both parents if both parents agree, *and* the court determines such an arrangement is in the best interests of the child. See Neb. Rev. Stat. § 42-364(3) (Cum. Supp. 2024). Lambertsen contends that both parties agreed to joint legal custody; therefore, the court should have ordered it.

In her complaint, Mann requested sole legal custody, although at trial she offered a parenting plan that awarded joint legal custody. Lambertsen advocated for joint legal custody. Regardless of whether the parties agreed that joint legal custody was in Scarlet's best interests, such an award was contingent upon the district court finding it to be in Scarlet's best interests. Based on the evidence presented, the district court declined to make that finding and we find no abuse of discretion in that decision.

Lambertsen testified at trial that the parties had difficulty communicating about decisionmaking from the time Scarlet was born, and that after their relationship ended, they continued to struggle. Both parties' testimony showed that most of their communication concerning Scarlet was facilitated through Lambertsen's mother. Moreover, in his appellate brief, Lambertsen contends Mann "frustrated her obligations as a joint legal custodian under the temporary order by refusing to share information with [Lambertsen] and by making decisions without involving [Lambertsen]." Brief for appellant at 22. This shows the parties' communication was either nonexistent or ineffective.

Also, Lambertsen's testimony indicated their communication was a source of conflict between the parties. Throughout his testimony, he accused Mann of intentionally misrepresenting Scarlet's medical history or excluding him from decisionmaking, and the basis of his concern and request for physical custody was the lack of communication between the parties.

Even if the evidence could support an agreement between the parties as to joint legal custody, the evidence shows the parties struggled to communicate regarding joint decisionmaking for Scarlet. The best interests of the child allow the court to consider minimization of contact and conflict between the parents in determining custody; therefore, the district court did not abuse its discretion in refusing to award the parties joint legal custody. See *Janda v. Janda*, 32 Neb. App. 953, 9 N.W.3d 212 (2024).

### (iii) Mann's Failure to Make Good Decisions

Lambertsen argues the evidence showed Mann's decisions for Scarlet were detrimental to Scarlet's "best interests and jeopardized her health and safety." Brief for appellant at 22. Specifically, he contends the evidence showed the parties' confusion surrounding whether Scarlet had COVID-19 and diabetes; Mann's poor decisions in regard to Scarlet's diaper rash; allowing Scarlet to cry at night rather than soothe her; refusing to enroll Scarlet in swimming lessons; refusing to potty train Scarlet; Scarlet having bruises and injuries while in Mann's care; and allowing Scarlet to be rough with dogs, posing a safety risk.

In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. See *Mann v. Mann*, 316 Neb. 910, 7 N.W.3d 845 (2024). Lambertsen testified to multiple instances of Mann having intentionally misinformed him or failing to communicate with him regarding Scarlet's

medical decisions and concerns, including the misunderstanding surrounding whether Scarlet had COVID-19 and Mann's concerns about Scarlet having diabetes. However, the district court's decision to award Mann sole legal custody indicates a finding that Mann was a more credible witness, as she testified she did not intentionally lie about Scarlet having COVID-19; rather, there was a misunderstanding. Also, text messages between the parties showed Mann informed Lambertsen she was concerned Scarlet had diabetes and explained this was because the child had been excessively thirsty, at least from Mann's perspective.

Regarding Scarlet's diaper rash, Mann testified she argued with Lambertsen only about the severity of the rash. She explained, in her experience working with young children, she frequently saw worse diaper rashes, and thus thought Lambertsen was exaggerating. Even though she disagreed about the severity of the rash, Mann still took steps to treat it including baking soda baths and ointment.

Even though Lambertsen complains that Mann allowed Scarlet to cry at night rather than soothe her, there is no evidence this caused harm to Scarlet. Rather, Lambertsen merely presents that the parties differ in parenting styles.

Lambertsen contends Mann refused to allow him to enroll Scarlet in swimming lessons, even though she testified she had plans to do so herself. However, Mann testified that, when Lambertsen's mother originally asked about swimming lessons for Scarlet, Mann thought Scarlet was too young, but she thought she was old enough at the time of trial.

Also, Lambertsen argues Mann refused to potty train Scarlet. At trial, Mann admitted she had sent a text to Lambertsen's mother which said she was not ready to potty train because she was not ready for Scarlet to grow up. However, she also testified she did not mean to say that she never wanted to potty train Scarlet, and she understood it was a part of life. She was just nervous to do so because Scarlet was her first child.

Lambertsen also asserts that Scarlet was at risk for harm in Mann's care. He asserts that Scarlet frequently had bruises, was injured by eating a hot pepper, and was at risk for being bitten by a dog, all while in Mann's care. Mann explained that Scarlet had bruises from climbing on tables, but that Mann would immediately remove her and instruct her not to climb. Mann also testified her and her mother's dogs had never bit Scarlet; Mann's dog had been around children his entire life and she did not believe the dog would bite Scarlet, as he was typically excited to see the child. Further, Mann testified she was teaching Scarlet how to gently interact with animals. Concerning the hot pepper, Mann testified Scarlet had accidentally gotten into the peppers Mann was using to make chili. There was no evidence this incident resulted in harm to Scarlet. Moreover, Lambertsen testified at trial that, other than Mann's lack of communication regarding Scarlet's medical decisions, Mann was an "amazing mother," and he believed Mann protected Scarlet's health and safety.

Upon our de novo review, we cannot find the district court abused its discretion in awarding Mann sole legal custody. The court was not required to abide by the parties' request to award joint legal custody. The court based its custody determination upon consideration of the parties' parental fitness and its findings were supported by the evidence. Thus, we reject Lambertsen's assigned error.

(b) Physical Custody

Lambertsen assigns the district court abused its discretion in awarding Mann sole physical custody of Scarlet. He argues the court's findings were inconsistent with the Parenting Act and the evidence presented, and that any argument he was required to prove the removal factors is without merit. He requests we reverse the district court and award him sole physical custody.

*(i) District Court's Findings As Related
to Parenting Act and Evidence*

Lambertsen contends the district court's findings related to Scarlet's best interests were contrary to the Parenting Act and case law and were in "direct contradiction" with the evidence. Brief for appellant at 34. Thus, he argues the findings did not support the court's determination that awarding Mann sole physical custody was in Scarlet's best interests. We disagree.

The court's order recognized the parties had shared joint physical custody under the temporary order but noted the parties living in different states presented a "practical dilemma to both parties having physical custody of Scarlet." The order stated:

It is inappropriate to permit a joint physical custody parenting order as the distance is unrealistic to expect Scarlet to endure while attending preschool and maintain[ing] extra-curricular activities even at her young age, and the Court finds a joint physical custody setting under these set of facts not to be in Scarlet's best interests. Such a physical custody situation will not promote a stable upbringing.

The parties resided approximately an hour apart and both indicated they intended to remain living in and have Scarlet attend school in their respective areas. Given the burden such distance would place on Scarlet's routine when she began school, the evidence supported the district court's determination joint physical custody would be contrary to her best interests.

In awarding physical custody, the district court considered the parents' capacity to provide physical care and satisfy Scarlet's educational needs. Specifically, it found that Mann's employment provided assistance with daycare and schooling when Scarlet reached the appropriate age. Although Lambertsen presented evidence of a potential daycare and public schools in his area, he had not taken any steps to secure a spot for Scarlet. Mann, however, testified she wanted to enroll Scarlet in the school system where she was employed and had taken action to explore that option.

As is relevant to stability of Scarlet's routine, the district court found that the area where Mann lived had been Scarlet's most consistent locale and that Scarlet's daycare and medical providers were located in this same area. The evidence showed Scarlet was born in Nebraska and lived there the majority of the time until the imposition of the temporary order.

Further, the court's findings included "Scarlet has always been with Mann except when sharing custody with Lambertsen after their separation," which shows the court considered Scarlet's relationship with each parent prior to the commencement of the action in determining her best interests. This finding was supported by the evidence as Mann stayed home with Scarlet for 5 months after she was born, and Scarlet lived with Mann the majority of the time until the imposition of the temporary joint custody order.

In consideration of Scarlet's general health, welfare, and social behavior, the court found Mann's employment provided more time for her to be with Scarlet during the week. Although Lambertsen tended to work less hours than Mann, Mann's employer was flexible. She had a rotating day off between Monday and Friday, and she testified she was able to take time off, if necessary, by calling in prior to the start of her shift. Lambertsen introduced no evidence of his employment being flexible. Rather, he testified he could be called into work early, or be required to stay late, depending on demand.

We also agree with the district court that the evidence indicated Lambertsen's mother was heavily involved in the raising of Scarlet, and that Lambertsen's parental fitness was dependent on his mother's assistance. The parties' testimony showed that Lambertsen's mother provided all necessary childcare for him, facilitated the majority of communication with Mann, picked Scarlet up from Mann at the start of his parenting time, and scheduled Scarlet's doctor appointments with the doctor in his locale.

Although Lambertsen testified he did not intend to reside with his mother forever nor to have his mother care for Scarlet every day, he had never lived independently and was dependent on his mother and stepfather to pay the entirety of his and Scarlet's expenses, including all bills and groceries. Overall, the lack of evidence Lambertsen would be able to independently provide for Scarlet's needs supported the district court's finding that his fitness as a parent was dependent on his mother's assistance.

Opposingly, Scarlet already attended daycare in Mann's locale, which Mann independently paid for. Mann also testified, in the event Scarlet was accepted into the daycare where she was employed, she would independently cover the cost of attendance not covered by her employee discount and financial aid.

Lambertsen also specifically argues that the court's finding that Mann appeared to have a more even temperament than Lambertsen was unsupported by the evidence. However, the court's finding was based in part upon its observation of the parties. We give deference to the district court's determination of contested factual issues, since it has observed the witnesses. See *Mann v. Mann*, 316 Neb. 910, 7 N.W.3d 845 (2024). Furthermore, evidence was introduced which showed that, during arguments between the parties, Lambertsen had broken a window in Scarlet's room after throwing a package of wipes, broken a laundry basket by throwing it at the ground, and pounded on a door after Mann had locked herself and Scarlet in a room.

Based on the totality of the evidence, upon our de novo review of the record, we find no abuse of discretion in the award of sole physical custody to Mann.

*(ii) Removal Requirements*

Toward the end of the trial, the issue of removal of Scarlet from Nebraska to Iowa was raised. The court engaged counsel in a conversation regarding whether the removal requirements of *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999) applied. On appeal, Lambertsen argues that the removal requirements are inapplicable in a filiation proceeding where custody has not yet been determined. Consequently, the court's reference to Nebraska being Scarlet's home state was unnecessary.

Other than the reference to Nebraska being Scarlet's home state, the district court did not discuss removal or the *Farnsworth* factors in its order. Its reference to Nebraska as Scarlet's home

state is "the minor child's home state is that of Nebraska, not that of the state of Iowa, where her father resides[,] and such distance will present an unacceptable impediment to Scarlet's development if joint physical custody is awarded and an unknown factor if physical custody [is] awarded to [Lambertsen]." We do not read this as implicating the *Farnsworth* factors, but rather as a recognition of the distance between the parties as it affects Scarlet's best interests in determining physical custody.

Because the district court did not improperly impose the removal requirements of *Farnsworth v. Farnsworth, supra*, we do not further address this argument.

## 2. NO ABUSE OF DISCRETION IN AWARD
## OF DEPENDENCY EXEMPTION

Pursuant to the parties' agreement, the district court allowed the parties to alternate claiming the tax dependency exception on their tax returns; however, it awarded Mann the exemption beginning in 2024 and every even year thereafter. Lambertsen assigns the district court abused its discretion in awarding Mann the reduction in 2024 and all even-numbered years because she had erroneously taken the deduction in 2022 and 2023. He requests we reverse the award and order he be allowed to claim Scarlet in 2024, and all even-numbered years thereafter.

An award of a dependency exemption is reviewed de novo to determine whether the trial court abused its discretion. See *Kelly v. Kelly*, 29 Neb. App. 198, 952 N.W.2d 207 (2020). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

A tax dependency exemption is an economic benefit nearly identical to an award of child support or alimony. *Kee v. Gilbert*, 32 Neb. App. 1, 992 N.W.2d 486 (2023). The primary purpose for permitting a trial court to reallocate the exemption is to allow the party paying support to have more disposable income from which to make such payment. *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015). In general, the custodial parent is presumptively entitled to the federal tax exemption for a dependent child. *Kee v. Gilbert, supra.* However, the child dependency exemption is ultimately entrusted to the discretion of trial courts. See *id.* A court may exercise its equitable powers and order the custodial parent to execute a waiver of his or her right to claim the tax exemption for a dependent child if the situation of the parties so requires. See *Kelly v. Kelly, supra*.

Here, the parties agreed to alternate the tax exemption and Lambertsen complains only of the court's order giving Mann the right in even number years because she previously benefited from the exemption in both 2022 and 2023. Because Mann is the custodial parent and is presumed to be entitled to the child tax exemption, see *Kee v. Gilbert, supra*, the court did not abuse its discretion in awarding her the tax exemption in 2024; however, because she has no objection to allowing Lambertsen the exemption beginning in 2024 and every even year thereafter, we modify the decree to allow Lambertsen the tax exemption in 2024 and every even year thereafter and to allow Mann the exemption in 2025 and every odd year thereafter.

## VI. CONCLUSION

For the foregoing reasons, we find no abuse of discretion by the district court and affirm its order awarding Mann sole legal and physical custody. We modify the decree awarding Lambertsen the right to claim the dependency tax exemption for Scarlet in 2024 and all even numbered years thereafter and Mann the right to claim in in 2025 and every odd numbered year thereafter.

AFFIRMED AS MODIFIED.